UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at Covington

| | | |
|---|---|---|
| ELIOTH EMMANUEL SALAZAR ORTIZ,<br><br>Petitioner,<br><br>v.<br><br>MARKWAYNE MULLIN, et al.,<br><br>Respondents. | ) | Civil Action No. 2:26-cv-00180-SCM<br><br>**MEMORANDUM OPINION AND ORDER** |

*** *** *** ***

The Petitioner, Elioth Emmanuel Salazar Ortiz, is a Mexican citizen and U Visa applicant who is detained by United States Immigration and Customs Enforcement at the Kenton County Detention Center. [Dkt. 1 at 2–3]. The Petitioner filed a Petition for a Writ of Habeas Corpus seeking immediate release or, in the alternative, a bond hearing. [*Id.* at 17–18]. The Petitioner later filed a Motion to Expedite, [Dkt. 7], and most recently filed a Petition for a Writ of Mandamus, [Dkt. 10]. For the following reasons, the Petitioner's Petition will be denied and his related Motion to Expedite will therefore be denied as moot.

## I. Facts

The Petitioner is a citizen of Mexico who is charged with being removable by reason of not possessing a valid travel document or valid identification at the time of his application for admission to the United States. [Dkt. 1-2 at 1, 4]. He is currently

held in the Kenton County Detention Center in Covington, Kentucky, under federal custody and is subject to removal proceedings. [Dkt. 1 at 2–4].

The Petitioner presented himself on November 15, 2022, at the San Ysidro port of entry, at which time he was detained by the Department of Homeland Security, issued a Notice to Appear, and subsequently released on parole. [*Id.* at 2, 9–10; Dkt. 1-2]. The Petitioner was designated as an "arriving alien" when he presented himself at the port of entry. [Dkt. 1 at 9, 17]. He ultimately applied for asylum relief, withholding of removal, and protection under the Convention Against Torture. [*Id.*at 2, 4]. The Petitioner's application for asylum and withholding of removal was denied on September 12, 2024. [*Id.* at 4]. The Petitioner later filed an application for a U Visa[1] on February 5, 2026. [*Id.*]. The Petitioner has been detained since approximately March 18, 2026, when he was taken into custody at an immigration appointment related to his U Visa application. [*Id.*].

## II. Analysis

This case highlights the absurd results compelled by the Sixth Circuit's opinion in *Lopez-Campos v. Raycraft*, 175 F.4th 713 (6th Cir. 2026), *petition for cert. filed*, No. 25-1415 (U.S. June 24, 2026). Under the reasoning of that opinion, noncitizens "who did not attempt lawful entry into the United States and are actively avoiding being inspected for lawful entry[] are not 'seeking admission' and are thus not subject to

---

[1] To be more precise, the Petitioner is "a derivative on his stepfather's U Visa application." [Dkt. 1 at 2]. "A U visa generally entitles an eligible noncitizen to lawfully remain in the United States and to seek work authorization." *Patel v. Wilkinson*, No. 19-4254, 2021 WL 2253966, at *1 n.2 (6th Cir. Feb. 1, 2021) (citing 8 U.S.C. §§ 1101(a)(15)(U) and 1184(p)(6)). It is thus a grant of lawful status.

§ 1225(b)(2)(A)'s mandatory detention scheme." *Id.* at 723. Instead, such noncitizens must be provided with a bond hearing in immigration proceedings pursuant to the statutory scheme set forth by 8 U.S.C. § 1226. But as soon as those noncitizens take an affirmative step to attain lawful admission to the United States, like filing a U Visa application, they no longer fit within the Sixth Circuit's holding and instead become subject to mandatory detention under 8 U.S.C. § 1225(b)(2). This outcome puts noncitizens to a Hobson's choice: They can either get a bond hearing by making no claim to lawful admission, or they can pursue whatever pathway to lawful admission may exist—with the guarantee of mandatory detention in the meantime and no promise that lawful status or release ultimately awaits them.[2] But this is the unavoidable consequence of the Sixth Circuit's reasoning, and so the Court is bound to conclude the Petitioner's choice to apply for a U Visa means he is properly detained under 8 U.S.C. § 1225(b)(2). In the alternative, the Court concludes that the Petitioner is properly detained under either 8 U.S.C. §1225(b)(1) or 8 U.S.C. §1225(b)(2) as an "arriving alien" because neither his parole into the United States nor the end of his parole changed his pre-existing legal status.

The Petitioner first argues that his detention is unlawful because the Government did not give him written notice when revoking his parole and otherwise

[2] In *Department of Homeland Security v. Thuraissigiam*, the Supreme Court characterized a similar situation as "creat[ing] a perverse incentive to enter at an unlawful rather than a lawful location." 591 U.S. 103, 140 (2020). The Court shares Judge Murphy's concern that the Sixth Circuit's opinion in *Lopez-Campos v. Raycraft* creates a comparable "perverse incentive." 175 F.4th 713, 755–56, 761 (6th Cir. 2026) (Murphy, J., dissenting) (quoting *Thuraissigiam*, 591 U.S. at 140).

"failed to follow their own regulations in revoking humanitarian parole" by not providing him with an individualized assessment before revoking his parole. [Dkt. 1 at 10–13]. In the alternative, the Petitioner argues that his detention violates his Due Process rights on various grounds. [*Id.* at 13–17]. His final alternative argument is that he is "not currently seeking admission to the United States" and so is detained pursuant to 8 U.S.C. § 1226, which he says applies to noncitizens who were present in the United States when they were detained and requires the Government to provide him with a bond hearing. [*Id.* at 17–18]. To buttress this argument, the Petitioner invokes the Sixth Circuit's recent decision in *Lopez-Campos*. [Dkt. 6 at 3 (citing *Lopez-Campos*, 175 F.4th 713)]. In that case, the Sixth Circuit held that mandatory detention without a bond hearing "applies to certain noncitizens who seek admission into the country, whereas [a] permissive detention scheme [requiring a bond hearing] applies to all other noncitizens pending a decision on their removability, with exceptions." *Lopez-Campos*, 175 F.4th at 722. In short, the Petitioner's position is that because he was paroled into the United States from a port of entry, he is entitled to the same protections and Due Process rights as a noncitizen who is encountered for the first time in the interior of the United States.

The Government argues in response that the Petitioner is detained under 8 U.S.C. § 1225(b)(2)—not 8 U.S.C. §1226—because he remains an "arriving alien" as a matter of law. [Dkt. 5 at 1]. This, the Government says, means that he is properly detained without a bond hearing. [*See* Dkt. 5 at 7–9 ("Bond has never been allowed for arriving aliens") (emphasis omitted)]. The Government contends that because the

Petitioner was encountered at a port of entry and was designated as an "arriving alien" at that time, neither the fact of his parole into the United States nor his later re-detention change his status or the statutory scheme under which he is properly detained. [*Id.* at 9–10]. The Government's position is essentially that because the Petitioner could have been mandatorily detained and processed for removal when he was encountered at a port of entry, his Due Process rights remain the same now as they were then, and he may now be mandatorily detained under the same authority despite the passage of time.

For the reasons below, the Court concludes that the Petitioner is properly detained under either 8 U.S.C. §1225(b)(1) or 8 U.S.C. § 1225(b)(2). The Court further concludes that the Sixth Circuit's opinion in *Lopez-Campos* does not control under the distinct facts and procedural history presented by the Petitioner's case. Thus, the Petition will be denied.[3]

[3] The Court is aware that the Petitioner filed a Petition for a Writ of Mandamus before the Sixth Circuit. [Dkt. 10]. Recognizing that the filing of such a petition does not divest a district court of jurisdiction or have the effect of staying proceedings in the district court, *see, e.g.*, *Goods v. Daley*, No. 2:24-138-DCR, 2025 WL 1746876, at *1 n.1 (E.D. Ky. June 24, 2025) (citing *Hill v. United States*, Nos. 02-CR-0728 (DRH) & 09-CV-4499 (DRH), 2017 WL 6624408, at *2 (E.D.N.Y. Sep. 20, 2017)); *Farrell v. US Bank Nat'l Ass'n*, No. 14-11781, 2015 WL 13035017, at *1 n.1 (E.D. Mich. Jan. 15, 2015); *Nascimento v. Dummer*, 508 F.3d 905, 910 (9th Cir. 2007)), this Court has endeavored to provide the Petitioner with a final resolution of the Petition for a Writ of Habeas Corpus so that the complex issues raised in the habeas petition can be considered through *de novo* appellate review rather than the more restrictive process involved in seeking a writ of mandamus.

**A. The Petitioner is properly detained under 8 U.S.C. § 1225(b)(2) because he is seeking admission.**

The Court addresses the Petitioner's final argument at the outset because it resolves this case. The Petitioner argues that he is properly detained, if at all, under 8 U.S.C. § 1226. This, he says, is because he was encountered within the United States and is not seeking admission. [Dkt. 1 at 17]. But that argument is untenable because the Petitioner himself notes that he "has consistently pursued . . . a U Visa." [Dkt. 1 at 17]. This means he is an applicant for admission who is seeking admission to the United States. That, in turn, means he is properly detained without a bond hearing pursuant to 8 U.S.C. § 1225(b)(2). *See Lopez-Campos*, 175 F.4th at 723. As a result, his detention does not violate the law.

The Sixth Circuit has explained "that for a noncitizen to be 'seeking admission' under § 1225(b)(2)(A), the noncitizen must actively be in search of lawful entry into the United States via inspection and authorization by an immigration officer." *Lopez-Campos*, 175 F.4th at 723. In other words, the noncitizen would need to "engage in some affirmative act or attempt towards 'admission'" to fall within the scope of 8 U.S.C. § 1225(b)(2). *Id.* at 722–23. The Petitioner has done so here.

To set the stage: "Admission" in this context means, "'with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.'" *Zhang v. Mukasey*, 509 F.3d 313, 315 (6th Cir. 2007) (quoting 8 U.S.C. § 1101(a)(13)(A)). Noncitizens who enter the United States for the first time illegally—although they may have physically "entered" the country—have

not been "admitted."[4] The date of such a noncitizen's "admission" is generally the date the noncitizen receives lawful status.[5] *See Stanovsek v. Holder*, 768 F.3d 515, 518 (6th Cir. 2014). This stands in contrast to those who entered the country on a valid visa—that is, who were admitted—and then overstayed their visa, thereby losing their lawful status. *See id.* ("[A] post-entry adjustment of status differs in its significance between individuals who had previously entered the U.S. legally, and those who had first entered the United States illegally and are only lawfully in the United Status after completing an adjustment of status."). A noncitizen who entered the United States for the first time illegally and who is now seeking to adjust to lawful status is seeking admission: "[F]or an alien who had entered the United States illegally . . . an adjustment of status is an 'admission' because an adjustment of status is the first point at which such an individual is *lawfully* in the United States." *Id.* (citing *Zhang*, 509 F.3d at 316).

The takeaway is that when someone "was never lawfully admitted" to the United States but physically enters the country and later applies for an adjustment to lawful status via a U Visa, "he qualifies as someone 'seeking admission.'" *Jimenez-*

[4] Although the Petitioner was paroled into the United States, "parole is not considered 'lawful entry of the alien into the United States,'" and so it cannot constitute an "admission." *Ming-Hui Wu v. Holder*, 567 F.3d 888, 891 (7th Cir. 2009) (quoting *Simeonov v. Ashcroft*, 371 F.3d 532, 536 (9th Cir. 2004)); *see also* 8 U.S.C. § 1101(a)(13)(B) ("An alien who is paroled under section 1182(d)(5) of this title . . . shall not be considered to have been admitted.").

[5] Some forms of lawful status—like asylum—do not qualify as "admission," though. *See Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021). But this point is not germane to the matter at hand.

*Rodriguez v. Garland*, 996 F.3d 190, 194 n.2 (4th Cir. 2021); *see also Lopez v. Noem*, No. 2:25-cv-764, 2026 WL 567653, at *4 (E.D. Va. Feb. 12, 2026) (distinguishing the petitioner in that case from the petitioner in *Jimenez-Rodriguez* because the latter "was actively seeking admission and lawful status" through a U Visa), *report and recommendation adopted*, No. 2:25-cv-764, 2026 WL 565806 (E.D. Va. Feb. 27, 2026). The Petitioner filed a "U Visa application." [Dkt. 1 at 4]. So, he is an "applicant for admission" who is "seeking admission."[6] That means he is properly detained under 8 U.S.C. § 1225(b)(2), and his detention without a bond hearing does not violate his Due Process rights. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020) (holding that the noncitizen in that case had no "entitlement to procedural rights other than those afforded by statute").[7]

**B. The Petitioner is properly detained under 8 U.S.C. § 1225(b)(1) or 8 U.S.C. §1225(b)(2) because his parole did not change his status as an arriving alien.**

Separately, the Court concludes that the Petitioner is lawfully detained

---

[6] The Petitioner is deemed by law to be an "applicant for admission" because he is "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . .)." 8 U.S.C. § 1225(a)(1).

[7] In *Thuraissigiam*, the Supreme Court reaffirmed the line of precedent establishing that "Congress is entitled to set the conditions for an alien's lawful entry into this country and that, as a result, an alien at the threshold of initial entry cannot claim any greater rights under the Due Process Clause." 591 U.S. at 107 (citing *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)); *see also id.* at 139 (rejecting the Respondent's argument because "[i]t disregards the reason for our century-old rule regarding the due process rights of an alien seeking initial entry"). Thus, the Court concluded that "aliens who arrive at ports of entry—*even those paroled elsewhere in the country for years pending removal*—are 'treated' for due process purposes 'as if stopped at the border.'" *Id.* at 139 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953) (emphasis added)).

pursuant to either 8 U.S.C. §1225(b)(1) or 8 U.S.C. § 1225(b)(2) because he is an "arriving alien," his parole never changed his legal status, and the end of his parole returned him to the custody from which he was paroled.

The Petitioner's argument on this front is somewhat scattered. On the one hand, the Petition states that because the Petitioner was granted parole, that grant must have been authorized by a particular statutory provision because "[t]here is no other legal authority that would have allowed [the Government] to release an arriving alien such as the Petitioner." [Dkt. 1 at 10; *see also id.* at 17 (stating "the Petitioner entered the United States as an 'arriving alien.'")]. In other words, he appears to acknowledge that he is classified an "arriving alien." However, in his Reply, the Petitioner argues that he should not be understood as an "arriving alien" and repeats that if he is detained lawfully at all, it must necessarily be under 8 U.S.C. § 1226 because he is not seeking admission. [Dkt. 6 at 2–4]. In support, the Petitioner relies on a decision authored by another judge in this district, which determined that "the expiration of parole does not return the undocumented immigrant to the status of an 'arriving alien' at the threshold of the United States." *See Methelus v. Mullin*, No. 26-158-DLB, 2026 WL 1505792, at *5 (E.D. Ky. May 29, 2026).

The Government's response on this point flows from longstanding Supreme Court authority and the statutory scheme governing detention of arriving aliens and parole. In short, the Government contends that the Petitioner was an "arriving alien" when he arrived at a port of entry, that a grant of parole never changed his legal status as an "arriving alien," and that the expiration of parole simply returns him to

the custody from which he was paroled—including his legal status as an "arriving alien." [Dkt. 5 at 8–11]. With great respect for the judges who have come to a different conclusion, the Court determines that the Government's interpretation more closely aligns with the relevant statutory language and Supreme Court precedent.[8]

To set the stage once more: Arriving aliens are generally required to be ordered "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). But if they express a credible fear of persecution, then they "shall be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii). However, they may also be temporarily paroled into the United States on a case-by-case basis for urgent humanitarian reasons or significant public benefit pursuant to 8 U.S.C. § 1182(d)(5)(A).[9] That is what evidently took place here.

A grant of parole does not change the noncitizen's legal status, though. The

[8] The Court recognizes that this issue is unsettled and that other courts have found it to be a "close question." *Cabrera Martinez v. Marich*, 816 F. Supp. 3d 356, 373 (W.D.N.Y. 2025); *see also id.* at 365 ("The harder question—on which there is not yet any binding authority—is what happens to the 'entry fiction' after parole ends? Put another way, once a previously paroled noncitizen has been living in the United States outside parole for a period of time, what is the person's status?").

[9] 8 U.S.C. § 1182(d)(5)(A) reads as follows: "The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he

Supreme Court has explained that "[w]hen an alien arrives at a port of entry—for example, an international airport—the alien is on U. S. soil, but the alien is not considered to have entered the country." *Thuraissigiam*, 591 U.S. at 139. "On the contrary, aliens who arrive at ports of entry—*even those paroled elsewhere in the country for years pending removal*—are 'treated' for due process purposes 'as if stopped at the border.'" *Id.* (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)) (emphasis added). This concept—that the border follows an arriving alien paroled into the United States such that the alien is understood to have never "ent[ered]" the country as a matter of law—is sometimes referred to as the "entry fiction." *Rosales-Garcia v. Holland*, 322 F.3d 386, 391 n.2 (6th Cir. 2003) (characterizing a noncitizen's physical presence in the United States combined with the lack of "entry" as a "paradox.").

That fiction was articulated at least a century ago in *Kaplan v. Tod*, where the Supreme Court concluded that an alien who was effectively paroled into the United States had "her prison bounds . . . enlarged by committing her to the custody of the Hebrew Society," but "the nature of her stay within the territory was not changed." 267 U.S. 228, 230 (1925). Rather, "[s]he was still in theory of law at the boundary line and had gained no foothold in the United States." *Id.* (citing *Nishimura Ekiu v. United States*, 142 U.S. 651, 661 (1892)). The Supreme Court concluded its opinion in *Kaplan* by noting that while effectively paroled, the noncitizen "is in custody at the

---

was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."

limit of the jurisdiction awaiting the order of the authorities," and because "[i]t would be manifestly absurd to hold" that the passage of five years would change the legal status of a noncitizen "held at Ellis Island for deportation," "the same" rule should apply to her. *Id.* at 231. The upshot is that the "entry fiction" operates to fix a noncitizen parolee's status in the eyes of the law, regardless of the parolee's physical location, because parole is a mere extension of grace in difficult circumstances.

Although new statutes governing immigration have been enacted since 1925, the "entry fiction" remains embedded in our law. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citing *Kaplan* for the proposition that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."); *see also Thuraissigiam*, 591 U.S. at 140 (citing *Mezei* for the proposition that "[l]ike an alien detained after arriving at a port of entry, an alien like respondent is 'on the threshold.'"). And other district courts confronting this question have concluded that the "entry fiction" means that a noncitizen like the Petitioner "returns to the custody, *including the accompanying legal status authorizing such custody*, from which [he] was paroled." *Flores Diaz v. Mullin*, No. 2:26-CV-00639-KWR-JHR, 2026 WL 1481585, at *2 (D.N.M. May 27, 2026) (emphasis added); *see also id.* at n.1 (collecting cases); *Chirinos Chirinos v. Tindell*, No. 3:25-CV-789-CHB, 2026 WL 926941, at *12 (W.D. Ky. Apr. 6, 2026) (holding that "upon the expiration of his parole, [the petitioner] reverted back to his prior immigration status that he held at the time of parole, that is, an applicant for admission actively

seeking admission”).

The decision in *Flores Diaz* is instructive here. Like the Petitioner in this case, the petitioner in *Flores Diaz* entered the United States and was detained that same day as an arriving alien. 2026 WL 1481585, at *1. Like the Petitioner, she was then paroled and filed an application for asylum. *Id.* And also like the Petitioner, she was later detained at an immigration appointment by the Department of Homeland Security. *Id.* Against that backdrop, the court determined that “the text of § 1182(d)(5)(A), application of the entry fiction doctrine, and fundamental separation of powers principles in the field of immigration” compelled the conclusion that “expiration of § 1182(d)(5)(A) parole requires Petitioner to return to the custody, including legal status, from which she was paroled.” *Id.* at *2. Thus, because the petitioner was detained under § 1225(b) prior to her parole, the expiration of her parole meant that she was once again subject to detention under § 1225(b). *Id.* at *14–15.

This Court agrees with *Flores Diaz*. Rather than repeating that opinion, the Court instead briefly recounts the most relevant portions here. The *Flores Diaz* court reached its conclusion first by applying the standard principles of statutory interpretation. The court noted that the word “custody” is undefined in 8 U.S.C. § 1182(d)(5)(A), and so the court gave the term its ordinary meaning “[a]t the point of enactment.” *Id.* at *3. “[C]ustody,” the court determined, means “[t]he care and control of a thing or person . . . . Also the detainer of a man’s person by virtue of lawful process or authority”; and the court further noted that “that ‘[t]he term is very elastic

and may mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or of taking manual possession.'" *Id.* (quoting *Custody*, BLACK'S LAW DICTIONARY (6th ed. 1990)). The court explained that the capacious definition of "custody" was not dispositive, though, and so the court next considered the "broader context of the statute as a whole." *Id.* at *4. After considering that context, the court reasoned that "[i]f the statute intended to confine 'custody' to mean 'physical custody' it would have used the word 'physical,' used the phrase 'in custody,' or used the word 'detention.'" *Id.* at *5. Because it did not, the court reasoned, the petitioner's "prior legal status" must have been included within the statutory phrase "shall forthwith return or be returned to the custody from which he was paroled." *Id.* at *6.

Next, invoking the principle that agency interpretations of statutes are not controlling but may nonetheless have the "power to persuade," the court considered related regulations touching on the issue of parole and custody. *Id.* (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. at 369, 413 (2024)). After taking those regulations into account, the court reasoned that "Congress was aware that the agency had been interpreting the phrase 'return to the custody' to mean 'restored to the status that he or she had at the time of parole'" when the relevant statutory amendments were enacted, and then concluded "that the plain text of § 1182(d)(5)(A) requires that Petitioner be returned to the 'custody,' including the status that authorized such custody, upon the expiration of parole." *Id.* at *6–7.

Finally, the court concluded that the "entry fiction" dispelled any remaining

doubt. The court reasoned that "[c]ase law and the interpretations of phrases consistently used throughout pre- and post-IIRIRA versions of § 1182(d)(5) parole, demonstrate that Congress intended that the entry fiction be applied to noncitizens paroled under § 1182(d)(5)(A)." *Id.* at *7. After canvassing a half-century of relevant case law from across the country, the court concluded that "courts that applied the entry fiction to § 1182(d)(5) parole focused on" statutory text that was not "altered by IIRIRA," and because "IIRIRA did not change any of the phrases relied upon by courts, including the Supreme Court, to apply the entry fiction," that means "Congress intended the fiction to continue to be applied." *Id.* at *10. And the court also reasoned that core separation-of-powers principles and "the very purpose of legal fictions" all compelled the conclusion that "§ 1182(d)(5)(A) requires a noncitizen parolee to be returned to the 'custody,' including the accompanying legal status, from which they were paroled." *Id.* at *14. This Court agrees with the foregoing reasoning from *Flores Diaz*. In short, "the entry fiction applies to § 1182(d)(5) parole and the 'custody from which he was paroled' includes a noncitizen's initial legal status." *Id.* at *10. This means that because the Petitioner was subject to mandatory detention under § 1225(b) prior to his parole, he is once against subject to mandatory detention under § 1225(b) after the end of his parole.

This Court acknowledges that other courts have reached the opposite conclusion, and there is a split of authority even within this district. In *Methelus*, for example, another judge in this district reached a contrary decision on slightly different grounds than those in *Cabrera Martinez* and similar cases. *See* 2026 WL

1505792, at *5 ("This Court and numerous other district courts have found that the expiration of parole does not return the undocumented immigrant to the status of an 'arriving alien' at the threshold of the United States."). But yet in *Chirinos Chirinos*, another judge of this district—albeit in a case pending in the Western District of Kentucky—reached the same result as *Flores Diaz*. *See* 2026 WL 926941, at *10–13. With deep respect for the judges who disagree, the undersigned is more persuaded by the reasoning in *Flores Diaz* and *Chirinos Chirinos*. The Court remains convinced that a proper application of Supreme Court precedent and the statutory scheme governing parole and detention of noncitizens compels the conclusion that the Petitioner is properly detained under either 8 U.S.C. §1225(b)(1) or 8 U.S.C. § 1225(b)(2) as an "arriving alien."

**C. The Petitioner's remaining arguments are unavailing.**

The Petitioner separately argues that his detention is unlawful because he was not given written notice or afforded an individualized hearing before his parole was revoked. [Dkt. 1 at 10–13]. This is wrong for at least two reasons. First, the Petitioner claims that he was still on parole when he was detained, [*Id.* at 11], but the Government has introduced the only *evidence* in the record on this point, and that evidence shows that the Petitioner's parole expired automatically in November 2023. [Dkt. 5-1 at 1 (indicating an "Admit Until Date" of November 14, 2023 and a "Class of Admission" of "DT"].[10] No notice or process was necessary for that to happen:

[10] The Government states that this document does not record a true "admission," but rather means the Petitioner's parole was automatically revoked after November 14, 2023. [Dkt. 5 at 6–7]. When presented with a document including similar information in *Chirinos Chirinos*, the court determined that the "admit until" date

Under 8 C.F.R. § 212.5(e)(1), parole may be automatically terminated without written notice "at the expiration of the time for which parole was authorized." Even judges who disagree about whether noncitizens should be treated as "arriving aliens" after their parole ends concur on this point. *See Penott Rodriguez v. Fields*, No. 26-117-DLB, 2026 WL 1078101, at *2–3 (E.D. Ky. Apr. 21, 2026) (noting that because parole automatically expires on the date provided by ICE "unless given an extension," the petitioner "was not entitled to written notice" prior to being detained) (citing 8 C.F.R. 212.5(e)(1)(ii)).

Second, even setting that aside, the decision to end the Petitioner's parole is a purely discretionary decision. *See Ofosu v. McElroy*, 98 F.3d 694, 700 (2d Cir. 1996) ("When, '*in the opinion of the Attorney General*,' parole is no longer warranted, 'the alien shall forthwith return . . . to the custody from which he was paroled.' [citing a substantively similar prior version of 8 U.S.C. § 1182(d)(5)(A) referring to the Attorney General instead of the Secretary of Homeland Security]. *The INS may*

---

records the date when a noncitizen's "parole expire[s]" and that a "Class of Admission" of "DT" "indicat[es] his parole status." 2026 WL 926941, at *1, *10 (citing United States Citizenship and Immigration Services guidance). Despite the Petitioner's statement that he never received "a date on which [his] parole would expire" and "was still on parole" when detained, [Dkt. 1 at 10–11], the Court concludes on the record before it that the Petitioner's parole automatically expired on November 14, 2023.

Confronting a similar issue in *Flores Dias*, the court concluded that "any delay in physically detaining Petitioner following the expiration of [his] parole should not be construed as altering [his] legal status from [being properly detained under] § 1225(b) to § 1226(a) since [he], legally, is immediately 'returned' to the border upon expiration of [his] parole." *See Flores Diaz v. Mullin*, No. 2:26-cv-00639-KWR-JHR, 2026 WL 1481585, at *14 n.5 (D.N.M. May 27, 2026). So the passage of time between the end of the Petitioner's parole in 2023 and his detention in 2026 is of no consequence.

*demand at any time that the alien return to custody*." (emphasis added)); *see also Palma v. Arteta*, 823 F. Supp. 3d 311, 322 (S.D.N.Y. 2026) ("Just as an alien may be arrested at the border without a bond hearing, so too may the Government revoke an alien's parole without a bond hearing."), *appeal withdrawn sub nom. Flores Palma v. Arteta*, No. 26-1198, 2026 WL 2210966 (2d Cir. June 1, 2026). And, pursuant to 8 U.S.C. § 1252(a)(2)(B)(ii), the judiciary lacks authority to review discretionary decisions like granting or ending parole.

Finally, the Court rejects the Petitioner's remaining Due-Process-based challenges to his detention, [Dkt. 1 at 13–17 (invoking *Zadvydas*, 533 U.S. 678)], because he is due only the process that Congress has seen fit to provide him, and the Court has already concluded that he is lawfully detained pursuant to either 8 U.S.C. § 1225(b)(1) or 8 U.S.C. § 1225(b)(2). *See Thuraissigiam*, 591 U.S. at 138–40.

## III. Conclusion

The Petitioner has failed to establish that his detention is unlawful. His mandatory detention without a bond hearing is authorized by statute, and thus he is not being deprived of his Due Process rights. His Petition is therefore denied, and his related Motion to Expedite is denied as moot.

For the reasons set forth above, **IT IS ORDERED** as follows:

1) The Petitioner's Petition, [Dkt. 1], is hereby **DENIED**.

2) The Petitioner's Motion to Expedite, [Dkt. 7], is hereby **DENIED AS MOOT**.

3) This matter will be **DISMISSED WITH PREJUDICE**.

4) A separate Judgment will be entered.

Signed this 10th day of September, 2026.

S. Chad Meredith, District Judge
United States District Court
Eastern District of Kentucky